**UNITED STATES of America,**
**Plaintiff,**

v.

**Luis MESA–ROCHE, Defendant.**

**No. 02–40151–01–JAR.**

United States District Court,
D. Kansas.

Oct. 23, 2003.

Ronald E. Wurtz, Office of Federal Public Defender, Topeka, KS, for Defendant.

Anthony W. Mattivi, Office of United States Attorney, Topeka, KS, for Plaintiff.

### *OMNIBUS ORDER DENYING DEFENDANT'S MOTIONS FOR DISCOVERY, DISMISSAL AND SUPPRESSION*

ROBINSON, District Judge.

Defendant Luis Mesa–Roche has filed three pretrial motions in this case: a Motion for Discovery Regarding Selective Prosecution (Doc. 16)[1]; a Motion to Dismiss (Doc. 18); and a Motion to Suppress (Doc. 23). On June 20 and July 31, 2003, the Court heard evidence concerning the discovery, dismissal and suppression motions and took the matters under advisement. After the hearing, Defendant filed a related Motion to Admit Impeachment

---

1. At the hearing held July 31, 2003, defense counsel indicated that this pleading had been misnamed, as Defendant is raising the defense of selective enforcement, not prosecution.

Evidence (Doc. 44). Defendant has also filed a supplemental pleading in support of his pretrial motions (Doc. 48) and the government has responded (Doc. 50). Based on the evidence presented, the Court concludes that the Motion for Discovery should be denied, as Defendant has failed to make the requisite showing of discriminatory intent. Having made an insufficient showing for purposes of his discovery motion, Defendant has also failed to present evidence warranting a dismissal of this case on grounds of selective enforcement in violation of the Equal Protection Clause. Defendant's motion to suppress was based in part on his claim of selective enforcement; the other grounds underlying his motion to suppress fail as well and Defendant's motion to suppress must also be denied.

**Facts**

*The Traffic Stop*

On September 20, 2002, shortly before 8:30 a.m., Deputy Kelly Schneider of the Russell County Kansas Sheriff's office observed a car driven by the Defendant on Interstate 70. Defendant is a Hispanic male of Cuban descent. Schneider was parked in the median area of I–70, which is a divided four lane highway. Schneider's patrol car was parked at an angle, facing the westbound lanes of I–70; but he was able to observe Defendant's car, which was traveling in the right eastbound lane of I–70. Schneider watched the car as it passed him, and then while looking over his shoulder, he observed the car pass a highway maintenance worker who was standing on the right shoulder of the highway. Schneider observed that although the car could have moved to the left lane, it instead came within three to five feet of the construction worker. The highway maintenance worker was standing between the white line marking the edge of the right lane and his truck, which was parked partially on the shoulder and partially on the grassy area next to the shoulder. Schneider perceived that the driver had recklessly or negligently driven too close to the worker, and decided to stop the car. Schneider turned his vehicle around in the median and sped to catch up to the car.

In less than three miles, Schneider caught up to the car. Schneider briefly pulled alongside the car, which he testified is a standard practice that allows the officer to determine the number of occupants of the car for purposes of officer safety. Schneider could see that there was only one occupant. Defendant testified that at this point, he and Schneider made eye contact. Schneider testified that he did not identify Defendant's race or ethnicity at this point.

Deputy Schneider stopped Defendant's car at approximately 8:30 a.m., based on his belief that he had witnessed a violation of K.S.A. 8–1530, failing to change lanes or reduce speed in the presence of an emergency vehicle.[2] Schneider had observed

---

2. K.SA. 8–1530 provides in relevant part:

(b) The driver of a motor vehicle upon approaching a stationary authorized emergency vehicle, when the authorized emergency vehicle is making use of visual signals meeting the requirements of K.S.A. 8–1720, and amendments thereto, or subsection (d) of K.S.A. 8–1722, and amendments thereto, shall do either of the following:

(1) if the driver of the motor vehicle is traveling on a highway that consists of at least two lanes that carry traffic in the same direction of travel as that of the driver's motor vehicle, the driver shall proceed with due caution and, if possible and with due regard to the road, weather and traffic conditions, shall change lanes into a lane that is not adjacent to that of the stationary authorized emergency vehicle; or

(2) if the driver is not traveling on a highway of a type described in paragraph (1), or if the driver is traveling on a highway of that type but it is not possible to change lanes or if to do so would be unsafe, the driver shall proceed with due caution, reduce the speed of

that the worker's parked truck had a yellow light bar on its roof. Schneider testified that he later determined that the possible violation was K.S.A. 8–1531,[3] not 8–1530. Schneider further testified that he also stopped the car because it appeared that the driver had not seen the worker and that he would have stopped the car under those circumstances, regardless of whether an emergency vehicle was present. Schneider testified that he had reason to suspect that the driver was impaired or fatigued although he observed no other driving behaviors that would indicate impairment.

Deputy Schneider approached the car and asked Defendant if he had seen the worker standing on the shoulder. Schneider testified that Defendant denied seeing the worker, confirming Schneider's suspicions. Schneider told Defendant that he should have switched lanes rather than driving so close to the worker. Defendant testified that he did see the worker, but that he did not come within a few feet of the man, whose truck was actually parked in the grassy area, not on the shoulder.

At Deputy Schneider's request, Defendant produced a driver's license, issued by the State of Nevada. Defendant also produced a rental agreement for the car. Schneider noticed that Defendant's hands were shaking as he handed these documents to Schneider. Both the driver's license and the rental agreement appeared to be in order and not expired. Schneider did notice, however, that this was a "third party rental"—the car had not been rented by Defendant, but by Daniel Mesa.

In response to Deputy Schneider's question about his travel plans, Defendant stated that he was traveling from Las Vegas to Philadelphia to visit his girlfriend. Schneider noticed that the car had been rented four days earlier, on September 18, 2002, and was due back on September 25, 2002, which would not allow much time for a visit in Philadelphia. Schneider also noticed that Defendant was nervous and that his hands continued to shake.

Deputy Schneider was suspicious of Defendant's conduct, description of travel plans, and the fact that the car was a third party rental. These suspicions were based on Schneider's observations and his 16 years of law enforcement experience, which included drug interdiction work, experience in searching more than 250 vehicles, and experience in seizing large quantities of marijuana, cocaine, methamphetamine and heroin.

### Obtaining Consent

Deputy Schneider returned the driver's license and rental documents to Defendant along with a written warning for failure to yield to an emergency vehicle. Schneider testified that he took two steps away from the car, signifying that Defendant was free to go, then asked Defendant if he could ask him "a couple of questions."

Deputy Schneider and Defendant disagree about what happened next. Schneider testified that Defendant agreed to answer questions. Schneider then explained to Defendant that Schneider sees a lot of drug contraband traveling on this

the motor vehicle and maintain a safe speed for the road, weather and traffic conditions.

**3.** K.S.A. 8–1531 provides:

Highway construction or maintenance operations; duty of driver.

(a) The driver of a vehicle shall yield the right-of-way to any authorized vehicle or pedestrian actually engaged in work upon a

highway within any road construction zone, as defined in K.S.A. 8–1458a, indicated by official traffic-control devices.

(b) The driver of a vehicle shall yield the right-of-way to any authorized vehicle obviously and actually engaged in work upon a highway whenever such vehicle displays flashing lights meeting the requirements of K.S.A. 8–1731, and amendments thereto.

highway. Schneider asked Defendant if he could look in the car and Defendant said yes. Defendant testified that Schneider did not ask for permission to search the car, but merely ordered him out of the car. Defendant further testified that he asked Schneider why he was searching his car and Schneider replied that it was Schneider's job to do so. Defendant claims that he never gave Schneider permission to search.

Because there is no videotape of the traffic stop, the Court must determine who to believe on the basis of their testimony and other evidence. Deputy Schneider's patrol car was equipped with a video camera, but this stop was not recorded. In fact, there are no videotapes of Schneider's traffic stops between August 13, 2002 and September 21, 2002. Schneider testified that the video camera had been periodically inoperable and repeatedly repaired. Schneider testified that the unit had been repaired while still under warranty, by Kustom Signal's sales representative in Russell, Kansas, by the Kustom Signal shop in Chanute, and in house by a technician employee of the sheriff's office. Schneider testified that on the date of this stop, it is possible that the video camera was not in the patrol car, but was being repaired.

The missing videotape and Deputy Schneider's explanations prompted Defendant to file a Motion to Admit Impeachment Evidence (Doc. 44) after the July 31, 2003 suppression hearing. Defendant asks the Court to admit evidence or to schedule a hearing on this motion. The subject evidence consists of an affidavit signed by Kevin Unrein, customer service manager of Kustom Signals, Inc., the vendor used by the sheriff's office to repair its video equipment. Unrein declares that Kustom Signals had custody of and repaired the video unit used by Schneider on only one occasion: from August 16, 2002 to August 20, 2002. Unrein further declares that Kustom Signals has no service center or technicians in the Russell County, Kansas area.

The government objects to the request for a hearing on Defendant's motion, but does not oppose the Court considering Unrein's out of court declaration, as long as the Court also considers the out of court, signed statement of Rick Harter, Kustom Signal's sales representative in Russell. Harter states that he worked on Schneider's video unit several times in August and September 2002, and that he did not submit a bill to the sheriff's office since Harter had sold and installed the unit for them in March 2002, and considered this warranty work. Defendant does not object to the government's motion that the Court consider both Unrein and Harter's out of court statements.

Unrein's affidavit does not directly impeach Schneider's testimony that the video camera had been periodically inoperable and had been repeatedly repaired in this time frame. It is of little consequence whether on September 20, 2002, the video camera was at Kustom Signal in Chanute, with Harter, or with the technician in the sheriff's office. The Court has no difficulty concluding that the video camera was out for repairs during this time frame; that there were no videotapes of any stops during this time frame; and that there is no evidence suggesting that Schneider deliberately failed to activate the video camera during the stop.

Thus, the Court determines whether Defendant consented to the search in the same manner as it often decides issues of fact—by evaluating the demeanor of the two witnesses with conflicting testimony, Deputy Schneider and Defendant. Based on the demeanor and substance of their testimony, the Court concludes that Schneider's testimony is credible and De-

fendant's testimony is not. Defendant does not deny that Schneider asked him about his travel plans. Defendant does not deny that Schneider explained to him the reason he was stopped. Defendant does not deny that Schneider told him that he has observed drug contraband traveling this highway. Defendant does not deny that Schneider asked him if he had contraband in the car. It is inconceivable to the Court that Schneider would have engaged Defendant in consensual conversation about the transportation of drugs and whether he had any such contraband, but would not have asked for consent to search.

## The Search

Upon searching the vehicle, Deputy Schneider noticed that the clothing hanger hooks in the back seat were loose, and that one of the plastic covers was removed, indicating that someone had taken it apart. Schneider found this suspicious because this was a new, 2002 model car. Schneider pulled the upholstery away from the plastic molded armrest and saw a package wrapped in plastic, which in his experience, appeared to be contraband. Schneider immediately exited the vehicle, and arrested and handcuffed Defendant. Schneider called for assistance. His subsequent search revealed three kilogram-sized packages of cocaine in the passenger side rear panel and another four kilogram-sized packages in the driver's side rear panel, for a total of seven kilograms of cocaine.

## Racial and Ethnic Profiling

In addition to the evidence concerning the traffic stop, search and seizure, the Court heard evidence concerning Defendant's claim that Deputy Schneider stopped him on the basis of his race or ethnicity, or in today's parlance, because of racial profiling. The Russell County Sheriff's office produced records indicating the race and ethnicity of motorists in traffic stops initiated by its officers in 2001. The records indicate that Schneider initiated traffic stops that were on average: 56.59% are white motorists; 33.69% are Hispanic motorists; and 9.72% are black motorists. Schneider patrols the stretch of I–70 passing through Russell County exclusively; he does not patrol any other roads in the county. Other officers in his department, who patrol other parts of the county but not I–70, initiated traffic stops that were on average: 90.27% white motorists; 5.57% Hispanic motorists; and 4.6% black motorists. These other officers together make about 60% of the traffic stops in Russell County. Schneider, who patrols the major interstate highway, alone accounts for about 40% of the traffic stops in Russell County.

As further evidence of racial and ethnic profiling, Defendant offered the *Lamberth*[4] study, commissioned by then Governor Bill Graves. The Defendant and the government presented expert statistical and research testimony from Dr. George Milliken[5] and Dr. Brian Withrow,[6] respectively. Both Dr. Milliken and Dr. Withrow testified at length about the validity of the *Lamberth* study and other studies that have attempted to record and compare the incidence of law enforcement action against discrete racial or ethnic groups, for purposes of evaluating claims of racial profiling or selective enforcement.

■ The *Lamberth* study surveyed traffic stops during four months in 2002, in

---

**4.** John C. Lamberth, Ph.D., *Racial Profiling Study and Services: A Multijurisdictional Assessment of Traffic Enforcement and Data Collection in Kansas* (Police Foundation, 2003).

**5.** Dr. Milliken is a professor of statistics at Kansas State University.

**6.** Dr. Withrow is an assistant professor of criminal justice at Wichita State University.

seven law enforcement agencies in Kansas.[7] The participating law enforcement agencies were instructed to compile stop data on actual traffic stops conducted by the law enforcement officers during the period of the study. The officers were instructed to record race or ethnicity as determined by the officer during the course of the stop. This could be determined either through the officer's observation, or by the officer asking the motorist to identify his or her race or ethnicity. This study recorded, among other things, the race and ethnicity of motorists stopped by the Kansas Highway Patrol in 2002, on I–70 between Colby, Kansas and the Kansas–Colorado border. The Court takes judicial notice that Colby is about 130 miles west of Russell County.

■ Based on the actual stop data recorded in the *Lamberth* study, on the Colby–Colorado border stretch of I–70, the Kansas Highway Patrol initiates traffic stops that are on average 5.7% black motorists and 6.8% Hispanic motorists, a significantly lower percentage than Schneider's stops that are 9.72% black motorists and 33.69% Hispanic motorists. The Court admitted the data from the *Lamberth* study. Because the author of the *Lamberth* study was not called as a witness, however, the Court did not admit the conclusions of the study, including the conclusion that officers were stopping black and Hispanic motorists for suspect reasons.[8]

All studies that seek to evaluate law enforcement action, must compare the data of actual law enforcement action with some type of "benchmark data." In measuring traffic stops, studies have compared actual stop data with essentially three types of benchmarks: the census population; the violator population; or the transient motorist population.

The census population benchmark compares the incidence or percentage of traffic stops of a discrete minority or ethnic group, with the actual resident population of that minority or ethnic group in the area. Defendant's expert, statistician Dr. Milliken, testified that the census population of Hispanics living in counties along I–70 from Russell to the Colorado border, ranges from .78% to 8.45%. Dr. Milliken found no appreciable difference in the census population of Hispanics living in Russell County, and Hispanics living in counties along the Colby–Colorado stretch of I–70. Although the census population of Hispanics is significantly less than Schneider's 33.69% incidence of stops involving Hispanic motorists, the census population may not reflect the population that an officer is exposed to in conducting the relevant law enforcement activity. For example, the *Lamberth* study illustrated that the population of Hispanic and black motorists along some stretches of the major interstates in Kansas exceeds the actual population of those minorities living in those areas.

Some studies use a violator benchmark, comparing data of actual law enforcement action against data of actual violators. Both experts agree that the violator benchmark is in theory, the superior benchmark. But, as Dr. Milliken testified, if the violator benchmark is based on data of actual law enforcement action, the benchmark may be flawed. Dr. Withrow agreed, testifying that a violator bench-

---

7. The study attempted to survey 10 law enforcement agencies in Kansas, including large, medium and small agencies. But, only 7 agencies were effectively surveyed: Overland Park; Wichita; Emporia; Olathe; Osage County; Park City; and Kansas Highway Patrol. Three agencies submitted inconclusive or incomplete data and thus were not included in the analysis: Kansas City, Hutchinson and Marysville.

8. Fed.R.Evid. 803(8)(C).

mark ignores the sociological phenomena of a higher incidence of law enforcement activity in urban, high crime areas, where there happens to be a larger population of minorities. The violator rate is thus affected by the higher incidence of police activity in locations with a higher incidence of minorities.

It may be possible to establish a violator benchmark that is not reliant on, nor biased by actual law enforcement activity. The State of New Jersey tried to determine whether its troopers were stopping minority drivers with greater or lesser frequency than warranted by the actual number of violations committed by these drivers. The *New Jersey Study* [9] used a violator benchmark that was not based on actual traffic stops, speeding tickets or other actual law enforcement activity. Instead, the study attempted to determine the violator benchmark without the taint or questionable effect of police bias in defining or affecting who the violators are. In this study, teams of observers recorded the race or ethnicity of turnpike motorists by studying high-quality digital photographs taken as the motorists entered the turnpike. The speed of the motorists' vehicles was recorded by radar gun. Thus, the teams of observers could compare the incidence of speeding by the race or ethnicity of the motorists. Their statistical analysis of the incidence of speeding was used to create a violator benchmark. [10]

The *Lamberth* study, as well as some other studies, have used the transient motorist population as a benchmark for comparison with actual law enforcement data. The transient motorist population is determined by visual observation of motorists and determination of their race, ethnicity or other relevant demographic information. In the *Lamberth* study, teams of observers visually surveyed the motorists driving in the survey areas of the seven participating law enforcement agencies. These survey areas were either stretches of highway, or certain intersections. The observers stationed themselves on the road side, and recorded the race or ethnicity of the motorist, and if time permitted, also the gender, age group and state of license plate. This "transient motorist population" data was used as the benchmark. Use of the transient population benchmark is particularly appropriate when measuring the traffic stop activity on Kansas's two major interstate highways, I–70 and I–35, which intersect in Kansas, and thus expose Kansas law enforcement officers to transient motorists driving from seacoast to seacoast, as well as from national border to national border.

Defendant relies on the transient motorist benchmark developed in the *Lamberth* study, although the *Lamberth* study did not measure the transient population on the stretch of I–70 that Schneider patrols in Russell County. Nevertheless, Dr. Milliken testified that one could expect the transient Hispanic population in Russell County to be about the same as such population on the Colby–Colorado stretch, because their census populations were about

9. James E. Lange, Ph.D., et al., *Speed Violation Survey of the New Jersey Turnpike: Final Report* (2001). This study was commissioned after the State of New Jersey entered into a Consent Decree with the United States to promote non-discriminatory law enforcement by New Jersey troopers under the supervision of a federal district court.

10. Highly summarized, the New Jersey Study revealed that very few drivers were traveling at speeds which the study defined as speeding (i.e. 15 mph over the speed limit in 65 mph zones). Of those drivers who were speeding, white drivers were found to be under-represented and black drivers were found to be over-represented. Black motorists comprised 16% of the turnpike drivers, comprised 25% of the speeders and comprised 23% of the stops by New Jersey troopers.

the same, and no other factor would significantly change the transient motorist population between the Colby–Colorado stretch and the Russell County stretch of I–70.

Some of the Hispanic transient motorist population on I–70 might be diverted to state Highway 83, which intersects I–70 at Colby and meanders south to Garden City and Dodge City, where there is a sizeable Hispanic population. But, the Court cannot conclude that Highway 83 would affect only that transient motorist population between Colby and Russell. While westbound I–70 travelers might exit I–70 at Colby to take Highway 83, one could expect that eastbound I–70 travelers might exit I–70 at Colby to take Highway 83 as well. Nothing suggests that Highway 83 significantly increases or decreases the transient motorist population of Hispanics on I–70 between Russell and the Colorado border.

Thus, the *Lamberth* study's transient motorist population benchmark of 2.6% black and 1.8% Hispanic motorists on I–70 can be extrapolated to the stretch of I–70 patrolled by Schneider. Assuming the transient motorist population benchmark established in the *Lamberth* study was based on an accurate measure of the race and ethnicity of transient motorists,[11] Schneider's incidence of 33.69% stops involving Hispanic motorists and 9.72% involving black motorists far exceeds the transient motorist population of those two groups.

The government offered testimony of Lieutenant Rich Jimerson, an interdiction officer with the Kansas Highway Patrol.

Trooper Jimerson testified that he teaches law enforcement officers drug interdiction techniques and that officers are never taught to consider race as a basis for making the initial traffic stop. Instead, officers are trained to look for factors indicating illegal activity before the stop is made. Trooper Jimerson further testified that officers were trained to pull up next to or near the vehicle prior to the stop for safety reasons, that is, to attempt to determine how many occupants are in the vehicle.

## Analysis

### A. *Fourth Amendment Challenge to the Traffic Stop and Arrest*

 Tenth Circuit cases "establish that a traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred … or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' "[12] Reasonable suspicion is defined as a "particularized and objective basis" for believing the person being stopped is committing or did commit a violation.[13] Reasonable suspicion requires a lesser showing than probable cause.

 The Supreme Court recently reiterated that, in making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.[14] The Court stressed that "[t]his process allows

---

**11.** See discussion *infra* regarding the questionable reliability and accuracy of this measurement.

**12.** *United States v. Ozbirn,* 189 F.3d 1194, 1197 (quoting *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc) (further quotations and citations omitted),

*cert. denied* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996)).

**13.** *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**14.** *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " [15]

Stopping the car because the Defendant had come dangerously close to the construction worker standing on the road side, satisfied the Fourth Amendment requirement of "some minimal level of objective justification" for making the stop.[16] Although Deputy Schneider was mistaken as to whether the possible traffic infraction was K.S.A. 8–1530 (failure to yield to emergency vehicles), he had reasonable suspicion that a traffic violation was being committed. In fact, K.S.A. 8–1531 makes it a violation to fail to yield the right of way to any authorized vehicle or pedestrian engaged in work upon a highway if the vehicle displays flashing lights, or engaged in work upon a construction zone.

▮ Although Deputy Schneider initially thought the Defendant violated K.S.A. 8–1530 instead of 8–1531, this does not invalidate the stop. "A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." [17] In recent years the Supreme Court has emphasized that a traffic stop will be upheld if, objectively speaking, the officer possessed probable cause or reasonable suspicion to carry out the stop.[18] Courts interpreting and applying the Court's directive have repeatedly ruled that an arrest or stop will be constitutional if an objectively valid basis for carrying out the seizure exists, even if the ground cited by the officer for justifying the stop is mistaken or even unconstitutional.[19]

Moreover, even if Defendant was not technically in violation of this statute, Deputy Schneider had reasonable suspicion that Defendant was an impaired or a reckless driver, based on his coming within three to five feet of the pedestrian construction worker. Prudent police practice justified this stop.

Defendant further contends that Schneider's decision to stop was motivated by Defendant's Hispanic ethnicity, and is therefore unreasonable under the Fourth Amendment. Schneider has testified that he was unaware of Defendant's ethnicity prior to stopping him. For the reasons set out in this order *infra* denying Defendant's motions alleging violation of the Equal Protection Clause of the Fifth and Fourteenth Amendments, the Court concludes that Defendant's evidence on racial profiling does not show that Schneider's stop was premised on racial or ethnic discrimination. Furthermore, since Schneider's search of the vehicle was with the consent of the Defendant, the evidence seized is not subject to suppression. Defendant's Fourth Amendment challenge fails.

## B. *Selective Enforcement and Equal Protection*

Defendant moves to dismiss on the basis of an equal protection violation based on

---

**15.** *Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

**16.** *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *I.N.S. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

**17.** *United States v. Shareef,* 100 F.3d 1491, 1505 (10th Cir.1996).

**18.** *See Arkansas v. Sullivan,* 532 U.S. 769, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (*per curiam* ); *Ohio v. Robinette,* 519 U.S. 33, 38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

**19.** *See, e.g., United States v. Bookhardt,* 277 F.3d 558, 565 (D.C.Cir.2002).

Deputy Schneider's selective enforcement of traffic laws. Specifically, Defendant asserts that Deputy Schneider uses Hispanic ethnicity as a basis for his decision to stop travelers on I–70 through Russell County. Defendant also seeks discovery related to this motion to dismiss.

■ The Equal Protection Clause precludes selective enforcement of the law based on race or ethnicity.[20] In its recent decision in *Marshall v. Columbia Lea Regional Hospital*,[21] the Tenth Circuit noted that such claims are troubling in that:

> Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.[22]

■ A defendant claiming unequal enforcement of a facially neutral statute must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory intent.[23] In order for a defendant to obtain discovery on these issues, the defendant need not establish a prima facie case of selective enforcement.[24] Nevertheless, given the heavy burden that discovery can impose on the government,[25] the show-

ing necessary to obtain discovery for a selective prosecution defense must "itself be a significant barrier to the litigation of insubstantial claims."[26] A defendant who claims he was targeted for enforcement of traffic laws because of race or ethnicity is entitled to discovery on that claim only if he presents *"some evidence tending to show* the existence of the essential elements of the [selective enforcement] defense, discriminatory effect and discriminatory intent."[27] A defendant cannot obtain discovery based on a bald, unsupported allegation of selective enforcement. Granting discovery subjects the governmental agency to considerable expense of time and money to gathering records, and obviously diverts its energy from its mission of law enforcement. Thus, the defendant must make some showing of discriminatory effect and discriminatory intent. The Court examines each element in turn.

### Discriminatory Effect

■ As a matter of law, long-standing equal protection jurisprudence has recognized that some measure of selectivity in the law enforcement arena is constitutionally permissible.[28] With that recognition, courts have required a defendant to make a credible showing that a similarly situated individual of another race or ethnicity

---

**20.** *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

**21.** 345 F.3d 1157 (10th Cir.2003).

**22.** *Id.* ("While it is appropriate that law enforcement identify any problem of racial profiling and undertake administrative steps to eliminate its improper use in law enforcement", it is quite another thing to "craft judicially manageable standards for determining liability, because of the broad discretion vested in executive branch officials to determine when to prosecute and by analogy, when to conduct a traffic stop or initiate an arrest").

**23.** *United States v. Armstrong*, 517 U.S. 456, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)

**24.** *United States v. James*, 257 F.3d 1173, 1178 (10th Cir.2001) (citing *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480) ("some evidence tending to show" standard).

**25.** *See Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480.

**26.** *Id.* at 464, 116 S.Ct. 1480.

**27.** *Id.* at 468, 116 S.Ct. 1480 (internal quotations omitted) (emphasis added).

**28.** *See Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *United States v. Borrego*, 2003 WL 21153252 (10th Cir. May 20, 2003).

could have been subjected to the same law enforcement action as the defendant, but was not.[29] This element of a "similarly situated individual" has been applied in claims of selective prosecution, to require a defendant to show not only that his racial or ethnic group is prosecuted more than another group, but that a similarly situated individual in another group was not prosecuted for the same offense.[30]

In this case, the government urges the Court to find that Defendant failed to make a credible showing of discriminatory effect because he has not shown that a similarly situated individual of another race was treated differently than he was. In *Armstrong*, a selective prosecution case, the Supreme Court stated that it is not enough to show a discriminatory effect, "a claimant must show that similarly situated individuals of a different race were not prosecuted."[31] While recognizing that such a showing presented some burden to the claimant, the Supreme Court balanced the burden discovery places on the government with the burden placed on the defendant, and specifically found that "[t]he similarly situated requirement does not make a selective-prosecution claim impossible to prove."[32] The fact that the similarly situated requirement did not foreclose a defendant from a showing of discriminatory effect, was critical to the Court's adoption of this balance, as addressed in *Armstrong*.

In selective prosecution claims, making a showing of a similarly situated individual is possible. The claimant is dealing with a defined universe of individuals with whom to compare; individuals who were arrested and prosecuted for the same offenses in that jurisdiction or some other jurisdiction. In *Armstrong*, the defendant raised a claim of selective prosecution in federal court of black defendants charged with distributing crack cocaine. Defendant could potentially make the showing that a similarly situated white defendant charged with distributing crack cocaine, was charged in state court, where the penalties were less severe.

In the seminal cases that the Supreme Court reviewed in its *Armstrong* decision, claimants could also rely on a defined universe of individuals with which to compare and show different treatment of a similarly situated individual. In *Ah Sin*,[33] a habeas petitioner challenged the selective enforcement of a San Francisco ordinance against having gambling tables in rooms barricaded to stop the police from entering. It was possible for the claimant to show a similarly situated individual of another race, who violated this ordinance in San Francisco without law enforcement response, for there was a limited and defined universe of individuals from which to identify a similarly situated person. In *Yick Wo*,[34] the claimant challenged the selective prosecution of Chinese launderers for violation of another ordinance in San Francisco. The claimant could potentially show a similarly situated individual, that is, a launderer of another race, who was not prosecuted. Because the class of persons who were potentially similarly situated to the claimant was an easily identified and limited class, launderers or applicants for laundry licenses in San Francisco, the exis-

29. *James*, 257 F.3d at 1179 (citing *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480).

30. *See, e.g., Armstrong*, 517 U.S. at 466, 116 S.Ct. 1480; *James*, 257 F.3d at 1179.

31. *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480.

32. *Id.* at 466, 116 S.Ct. 1480.

33. *Ah Sin v. Wittman*, 198 U.S. 500, 503, 25 S.Ct. 756, 49 L.Ed. 1142 (1905).

34. *Yick Wo v. Hopkins*, 118 U.S. 356, 373, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

tence of a similarly situated individual was susceptible to proof.

■ But, as the Seventh Circuit's well reasoned opinion in *Chavez v. Illinois State Police* [35] concludes, *Armstrong* is distinguishable from a selective enforcement claim based on a traffic stop. *Armstrong* and other selective prosecution and enforcement cases in which there is a limited and identifiable class of individuals pose no insurmountable burden to a claimant required to show a similarly situated individual.[36] But to a claimant raising a selective enforcement claim that challenges a traffic stop, such requirement imposes an insurmountable burden on the claimant. In striking the balance between the burden on the defendant of requiring a showing, with the burden that discovery places on the governmental agency, the Supreme Court in *Armstrong* relied on the fact that the burden on the claimant was not insurmountable, stating "[t]he similarly situated requirement does not make a selective-prosecution claim impossible to prove." [37]

In the context of a challenged traffic stop, however, imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the defendant to make a credible showing that a similarly situated individual was *not stopped* by the law enforcement. How could a defendant, *without discovery*, ever make such a showing? Would a defendant have to hire an investigator to patrol the same stretch of highway patrolled by the arresting officer, and then observe and record other motorists who present probable cause or reasonable suspicion of violating the same traffic law that was the basis for stopping the defendant? Even if a defendant accomplished that, how could a defendant show the other motorist was in fact similarly situated to the defendant; that the officer had the same opportunity to perceive and evaluate that motorist's driving as the officer had to perceive and evaluate the defendant's driving; and that all of the facts and circumstances that the officer relied on in exercising discretion and selecting the defendant to stop, were the same facts and circumstances presented with the motorist that the officer did not stop?

More importantly, how could a defendant even *with discovery*, show a similarly

---

**35.** 251 F.3d 612, 637 (7th Cir.2001). *But see Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir.2003) (Despite the seemingly impossible burden, the Eighth Circuit requires proof that a similarly situated person was not stopped where a motorist is challenging their own stop on equal protection grounds); *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir.2000) (When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose).

**36.** There is another notable distinction between *Armstrong* and the seminal cases it discusses, and the selective enforcement claim at bar. In *Armstrong*, the Court was mindful of the great deference due the Executive Branch in its exercise of its special province to enforce the laws, thus recognizing that long standing "presumption of regularity" accorded prosecutorial decisions. The Court was also mindful that to invalidate the San Francisco ordinances at issue in *Ah Sin* and *Yick Wo*, would constitute a serious interference by the Federal Court, with the "course of criminal justice" of a State. *Armstrong*, 517 U.S. at 466–467, 116 S.Ct. 1480. This case presents no issue of federalism. Nor is the deference accorded to the executive branch's power to prosecute accorded to law enforcement to the same degree. In the civil context, prosecutors are bestowed with absolute immunity for decisions and actions that are within a prosecutor's scope of responsibility; law enforcement officers are bestowed with only qualified immunity. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**37.** *Armstrong*, 517 U.S. at 466, 116 S.Ct. 1480.

situated individual who was *not stopped*? Law enforcement agencies keep records of law enforcement activity. Like many police agencies, the Russell County Sheriff does not record every traffic stop an officer makes. Rather, the only recorded stops are those that result in a written ticket or warning citation. Stops that result in a verbal warning are not recorded. To the extent that there is a record, it often doesn't include pertinent data such as race or ethnicity.

In fact, a law enforcement agency cannot record any, much less all pertinent information on the dozens, hundreds, or even thousands of motorists who are not stopped within a patrolling officer's given space and time. If a law enforcement agency engaged in this type of activity, a nation of our democratic principles and constitutional liberties would find abhorrent such a practice of recording information on every person the officer encounters while on patrol, even those who are not arrested, stopped or otherwise engaged by the officer.

 It is virtually impossible to identify a "similarly situated" individual who was not stopped. The person cannot be identified at all, nor is there any recorded information from which one can compare whether the motorists presented similar factors to an observing officer, such that there has been disparate treatment or not. Because law enforcement agencies do not

make or keep records on individuals they do not stop, and certainly not on "similarly situated" individuals they do not stop, imposing such a requirement on this Defendant or any defendant who challenges a traffic stop as selective enforcement, effectively denies them any ability to discover or prove such a claim. Thus, the defendant challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way.

The Tenth Circuit has indicated that a defendant can demonstrate discriminatory effect by either showing a similarly situated individual, *or* by relying on statistical evidence. In its recent *Marshall* decision,[38] the Tenth Circuit stated that claims of racially discriminatory traffic stops and arrests should be held to a "similarly high standard," comparing them to the standard required for claims of selective prosecution. Yet, the Tenth Circuit did not foreclose the use of statistical evidence to meet the requisite showing of discriminatory effect. In *Chavez*, the Seventh Circuit stated that statistical evidence of discriminatory effect should be accepted as proof of a selective enforcement claim based on a traffic stop.[39] The Supreme Court has long noted the importance of statistical analysis "in cases in which the existence of discrimination is a disputed issue."[40]

 The Supreme Court has certainly considered statistical evidence as sufficient

---

**38.** 345 F.3d 1157, 1166–1169.

**39.** *Chavez*, 251 F.3d at 637–638 (citations omitted).

**40.** *Id.* at 637 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)); *Yick Wo v. Hopkins*, 118 U.S. at 374 (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese launderers where the city denied the petitions of some two

hundred Chinese applicants who applied for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who applied); *Hunter v. Underwood*, 471 U.S. 222, 227, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (finding that the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was "indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites").

evidence of discriminatory effect in some cases. In *Yick Wo*, for example, discriminatory effect or impact was proved by showing that all 200 applications by Chinese launderers were denied; while only 1 of 90 applications by white launderers was denied.[41] And, in *Hunter v. Underwood*,[42] the Court was satisfied with statistical evidence of discriminatory effect, to wit: the challenged state law made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites. While helpful, purely statistical evidence is rarely sufficient to support an equal protection claim, but can be sufficient to establish discriminatory effect.[43]

### Defendant's statistical evidence

Defendant presents statistical evidence of the race and ethnicity of traffic stops by Deputy Schneider in Russell County, compared with stops by other officers in the Russell County Sheriff's Office, and compared with stops by Kansas Highway Patrol troopers patrolling a stretch of I–70 west of the stretch that Deputy Schneider patrols. These statistics show that Deputy Schneider is stopping Hispanic motorists at a significantly higher rate than other officers in his department. Deputy Schneider's traffic stops are 56.59% white motorists; 33.69% Hispanic motorists; and 9.72% black motorists. In comparison, his fellow officers' traffic stops are on average: 90.27% white motorists; 5.57% Hispanic motorists; and 4.6% black motorists. Yet, this statistical difference may be explainable in whole or in part by the demographic differences in the motorists that Deputy Schneider encounters while on patrol with the motorists that his fellow officers encounter while on patrol. Because Deputy Schneider patrols I–70 almost exclusively,

the transient motorist population he encounters is quite different from the population encountered by his fellow officers who patrol in the city and county of Russell, but not on I–70. In fact, there is no dispute that the transient motorist population of Hispanics along I–70 in Russell County is greater than the census population of Hispanic residents of Russell County.

A better comparison is Deputy Schneider's traffic stops on I–70 with the *Lamberth* study's findings concerning the traffic stops by Kansas Highway Patrol on I–70. Deputy Schneider's traffic stops of Hispanic motorists are significantly higher than the traffic stops of Hispanic motorists by Kansas Highway Patrol troopers who patrol a stretch of I–70 some 130 miles to the west of Deputy Schneider's area of patrol. Kansas Highway Patrol troopers patrolling I–70 between Colby and the Kansas–Colorado border, make traffic stops that are on average: 6.8% Hispanic motorists and 5.7% black motorists. There is a significant difference in stops that are 6.8% Hispanic motorists and stops that are 33.69% Hispanic motorists, which cannot be explained by any significant difference in the transient motorist population encountered by Kansas Highway Patrol troopers and Deputy Schneider. If there are factors that explain the difference, they have not been presented to this Court. The fact that traffic flows off and on I–70 to Highway 83 en route to communities with a more sizeable Hispanic population, does not show that the transient motorist population on I–70 in Russell County is more Hispanic than the transient motorist population on I–70 between Colby and the Colorado line. The *Lamberth* study established that the transient motorist population of Hispanics traveling

---

**41.** 118 U.S. at 374, 6 S.Ct. 1064.

**42.** 471 U.S. 222, 227, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985)

**43.** *Chavez*, 251 F.3d at 640; *see McCleskey v. Kemp*, 481 U.S. 279, 293 n. 12, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

on I–70 between Colby and the Colorado line is 1.8%; and there is no reason to think that benchmark differs for the stretch of I–70 that passes through Russell County.

Clearly, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." [44] And, this Court's analysis of the methodology of the *Lamberth* study convinces the Court that there are flaws in the *Lamberth* statistics. The *Lamberth* study measured the actual stop data of participating law enforcement agencies; and it measured the transient motorist population that the participating law enforcement agency was exposed to. In this case, Defendant compares Russell County's stop data on Deputy Schneider's traffic stops with the *Lamberth* study's data on traffic stops by Kansas Highway Patrol troopers on I–70 from Colby to the Colorado line. To the extent the *Lamberth* stop data is flawed, it affects the validity of a comparison with the data on Deputy Schneider.

Based on the testimony of the experts and analysis of the *Lamberth* study methodology and design, the Court is not firmly convinced that the stop data is completely accurate and reliable. The stop data was self reported by the agencies, and as Dr. Withrow noted, this presents the potential for injection of bias into the sample. Indeed, three of the agencies originally included in the study were excluded because of irregularities that might evidence some bias.[45] As Dr. Withrow testified, when a person knows their activity is being observed or evaluated, they may change their activity, a phenomena referred to as "reactivity." The researchers did nothing to verify the accuracy of the information they received from the police agencies.

The *Lamberth* study breached an inviolate rule of the scientific method: the agencies surveyed were allowed to pick or suggest the sites to be studied. Whether the agencies selected the sites they perceived to be least problematic, or most problematic, or whether the agencies used some other criteria, the study is certainly not based on a random sample.

The Court finds no reason to impugn or question the data self-reported by the Kansas Highway Patrol. The Kansas Highway Patrol admittedly selected areas in which it was concerned there might be a high incidence of traffic stops of minorities. In effect, the Kansas Highway Patrol may have selected areas that exhibit a higher than average incidence of traffic stops of minorities. If that is what happened here, then the Kansas Highway Patrol's 6.8% incidence of Hispanic motorist stops, makes even more suspect, Deputy Schneider's 33.69% incidence of Hispanic motorist stops. Even if the Kansas Highway Patrol's data is not overstated, or even if the *Lamberth* stop data on the

---

**44.** *Teamsters,* 431 U.S. at 340, 97 S.Ct. 1843.

**45.** The data submitted by Kansas City, Kansas, a large city police department, was inconclusive because the officers recorded the race of the motorist based on their perception "before" the stop, not based on their perception after the stop, as the study required. Because the officers were trained to record "unknown" if they weren't sure, the data includes a high number of unknowns. Although this problem was corrected, the recorded stops at the benchmark locations dropped by two-thirds, suggesting that the officers were under-reporting the stops. Likewise, the data from Hutchinson was inconclusive because the number of reported stops at the benchmark locations dramatically decreased once the study was underway. The data from Marysville was inconclusive for another reason; during the study, the police force decreased by one-third, such that there were too few stops to create a sufficient sample.

Highway Patrol is not entirely accurate or reliable, Deputy Schneider's incidence of stops of Hispanic motorists still establishes discriminatory effect.

There are also questions about the reliability and accuracy of the *Lamberth* study's measurement of the transient motorist population. The methodology of collecting the transient motorist data was flawed. It is telling that the Defendant's witness, Dr. Milliken, testified that to obtain a good sample of data in Russell County, one would need to collect data on 3 to 4 thousand stops, over a period of two years. Yet, the *Lamberth* study collected data on fewer than 3000 stops, and those stops were not isolated in one city or area, but were the total stops associated with the areas surveyed for the seven participating law enforcement agencies. Moreover, the *Lamberth* study collected data over a four month period. Dr. Withrow noted that there was an inadequate number of samples collected, over an inadequate period of time. He further noted that the study failed to account for seasonal changes in the demographics of drivers. This study collected data over four winter months, a period in which older drivers are less likely to drive.

Furthermore, the accuracy and reliability of those who observed and recorded the race or ethnicity of the motorists, is suspect. This data was collected by using "spotters" who observed and recorded the race and ethnicity of the motorist (as well as age, gender and the state in which the license tag was issued). An obvious concern is the accuracy of the spotters' recorded data, in light of the short period of time they have to record this information as a car passes them by. According to Dr. Milliken, the overall reliability generally ranged from .84 for tests done in dusk/dark conditions to .93 for tests done in daylight. But, as Dr. Withrow pointed out, there was no verification of the accuracy of the observer, by spot check, by multiple observations of the same vehicle, or otherwise. For example, the study does not detail the individual observer's rate of completion, i.e., how many cars in which they were able to evaluate the driver, and how many they were not.

The study did not sufficiently test the accuracy of the recorded racial and ethnic data, by using multiple spotters per each vehicle. And although the study did use an "interrater reliability" test for quality control, it used this test only twice out of the many incidences of spotter tests conducted for multiple police departments at multiple places and times. Thus, there is some question as to whether the spotters accurately recorded the race or ethnicity of those they observed.

■ Despite these concerns, however, in this case, the Court is convinced that Defendant has established discriminatory effect. Even if the transient motorist population of Hispanics is understated as a result of the flaws in the *Lamberth* study methodology, the comparison of Deputy Schneider's incidence of stops with the incidence of stops by Kansas Highway Patrol still constitutes a strong showing of discriminatory effect.

■ The Court also rejects the government's criticism that the entire *Lamberth* study should be disregarded because it rests on an invalid presumption, that Hispanic, black and white motorists violate traffic laws at the same rate, such that any difference in traffic stops for violations suggests an improper reason for the stop. To be sure, the courts have rejected a number of Equal Protection and Fourth Amendment challenges based on assumptions that discrete racial or ethnic groups violate particular laws at the same rate as other groups.[46] But it is important to

---

**46.** *See, e.g., Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480 (rejecting the Court of Appeals

distinguish this case from *Armstrong*,[47] where the Supreme Court rejected a Court of Appeals analysis that was based on a presumption that all races commit all types of crimes. The Court noted that statistics of the United States Sentencing Commission showed that distinct differences in the incidence of persons sentenced in 1994 for certain offenses: more than 90% of those sentenced for crack cocaine trafficking were black; 93.4% of those sentenced for LSD trafficking were white; and 91% of those sentenced for pornography or prostitution were white.[48]

The *Lamberth* study does not rest on a presumption that a particular offense is violated with equal frequency by members of all racial or ethnic groups. Surely those defendants who have asked the courts to accept such assumptions were misdirected, given the anecdotal, as well as statistical evidence suggesting otherwise, particularly with respect to certain offenses. Rather, in this case, Defendant is not claiming selective prosecution or selective enforcement of a *particular offense.*

The *Lamberth* study presumes that there is no appreciable difference in the incidence of racial and ethnic groups violating one or more of the many traffic laws that justify a traffic stop. At first blush, this may seem an unsupported and unsupportable assumption, but it is not. Law enforcement officers are charged with policing a large universe of traffic violations.

Deputy Schneider testified that there are dozens of reasons why he has stopped people, everything from equipment problems, to signs of fatigue, to speeding, to reckless driving. In Kansas, there are well over fifty traffic violations, running the gamut from speeding, to driving under the influence, to equipment violations.[49]

These infractions include a number of violations that require the exercise of judgment and discretion by law enforcement officers. How many times must a motorist's wheels touch the white line separating a lane to exhibit inattentive driving? How closely does a driver need to follow another vehicle to be not reasonably prudent; and under what circumstances is the close distance between two vehicles unavoidable? Officers are trained to evaluate behavior, and to exercise discretion in determining when there is reasonable suspicion or probable cause to believe a traffic violation has occurred or is occurring.

Officers are faced with multiple violations by multiple motorists, requiring a choice of whom to stop. Officers know that effecting a stop of one motorist may prevent them from stopping a more serious violation they observe while they are in the middle of processing that stop. Thus, they make decisions about when and when not to stop. This endowed discretion is necessary and appropriate for the effec-

analysis that was based on a presumption that all races commit all types of crimes); *James*, 257 F.3d at 1179–80 (rejecting a challenge that was based on the assumption that whites and blacks are addicted to and thus distribute crack cocaine at an equal incidence). Notably, the challenge to these assumptions is often that they are made without regard to the effect that selective law enforcement may play in the recorded violator rate. As Dr. Withrow notes, there is a greater law enforcement presence in inner cities, where a higher crime rate prevails and where there is a higher population of minorities. Greater police presence translates into greater investigative presence, and surely some effect on the incidences of arrests and prosecutions.

47. 517 U.S. at 469, 116 S.Ct. 1480.

48. *Id.*

49. The Uniform Act Regulating Traffic; Rules of the Road is found at K.S.A. Article 15, 8–1501 et. seq. This Act includes, by the Court's count, over 50 rules of the road and thus, over 50 potential traffic violations.

tive enforcement of traffic laws and for the effective protection of public safety.

The government touts the *New Jersey Study*, as refuting any presumption that traffic laws are violated at the same rate by all groups. But, the *New Jersey Study* considered only one traffic violation, speeding; it did not attempt to measure the violation rate of all traffic violations that officers use to justify traffic stops. Moreover, the *New Jersey Study* is itself seriously flawed.[50]

Thus, the proper consideration here is whether there are any differences in the incidence of traffic violations by different racial and ethnic groups when one considers all such violations, and when one considers the host of reasons officers rely on in effecting a traffic stop. Based on the testimony of the officers, that they stop vehicles for many reasons and that they stop motorists of all races and ethnic groups, but not with regard to their race or ethnicity, the Court concludes that the premise of the *Lamberth* study is valid. There is simply no evidence suggesting that as a whole, a particular racial or ethnic group presents the facts and circumstances justifying a traffic stop, with any greater frequency than any other racial or ethnic group.

### Discriminatory Intent

 Having satisfied the discriminatory effect prong, Defendant must also make a credible showing of discriminatory intent, in order to obtain discovery or dismissal of his selective enforcement claim. In order to prevail, a defendant must prove that the government's enforcement of traffic laws against him "was invidious or in bad faith and was based on impermissible considerations such as ... the desire to prevent the exercise of constitutional rights."[51] Discriminatory intent requires more than a showing of an intentional act done with knowledge of the racial impact: "It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[52] To establish discriminatory intent, the defendant must produce some evidence tending to show that the law enforcement officer acted with discriminatory purpose specific to his own case and must support an inference that racial considerations played a part in his treatment.[53]

Defendant offers scant direct evidence specific to his case that would support an inference that racial considerations played a part in his stop. There is no evidence that Deputy Schneider treated, spoke to, or otherwise exhibited discriminatory behavior towards Defendant or any other persons previously stopped by Schneider for a traffic violation. Schneider denies that he stopped the Defendant because he

---

**50.** In the *New Jersey Study*, great measures were taken to assure the accuracy of the identification of race. The race or ethnicity of the motorists was determined by teams of three persons who studied each photograph. If two of the team of three could not agree on the race or ethnicity, the data was discarded. Thus, persons whose race or ethnicity was not readily determinable were not included in the study. But persons whose race was more readily perceivable, such as dark or brown skinned blacks, might therefore be over represented in the study. For this reason alone, the *New Jersey Study's* conclusion that black motorists have a statistically significant higher incidence of speeding is suspect.

**51.** *United States v. Salazar,* 720 F.2d 1482, 1487 (10th Cir.1983), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985).

**52.** *McCleskey,* 481 U.S. at 298, 107 S.Ct. 1756 (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (footnote and citation omitted)).

**53.** *Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480; *McCleskey,* 481 U.S. at 292, 107 S.Ct. 1756.

was Hispanic. In fact, Schneider testified that at the moment he decided to stop the Defendant's vehicle because it had nearly struck a highway worker, he had "no idea" of Defendant's race or ethnicity. Defendant notes that Deputy Schneider pulled next to Defendant before signaling him to stop, implying that Schneider observed Defendant's appearance before making the stop. But Schneider and Trooper Jimerson testified that this is a standard practice that allows the officer to determine the number of occupants of the car for purposes of officer safety. The Court finds no reason to believe that Schneider's decision to stop Defendant came only after observing Defendant's race or ethnicity.

Direct evidence of discriminatory intent was sufficient to avoid summary judgment on a § 1983 claim of selective enforcement in the Tenth Circuit's recent *Marshall* decision.[54] There the defendant was able to present evidence of the officer's behavior during the events in question as well as the officer's alleged record of racially selective stops and arrests in drug cases under similar circumstances.[55] The defendant offered evidence that he did not commit the alleged traffic violation and that the officer made eye contact with him prior to activating his emergency lights. As soon as the officer approached the defendant, he accused him of being on crack, an accusation the officer repeated several times during their encounter. When the officer filled out the citation form, he noted the defendant's race, although the form called for no such designation. Most compellingly, this officer had an extensive recorded history of similar misconduct during his prior employment as a police officer in another jurisdiction.[56]

The Tenth Circuit stated that:

A challenge to the specific acts of a particular police officer bears some resemblance to a claim of racial discrimination in the use of peremptory jury challenges, which also involves the acts of a single state actor (the prosecutor) in the course of a single incident (the selection of the jury). In such cases, the Supreme Court has instructed that the court should consider all relevant circumstances, including the prosecutor's pattern of strikes against black jurors, and the prosecutor's questions and statements, which may support or refute an inference of discriminatory purposes. Similarly, a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context.[57]

■ In this case, however, Defendant has no direct evidence, nor any circumstantial evidence showing discriminatory intent or motive, and asks the Court to do that which higher courts have already refused to do, infer discriminatory intent from the statistical evidence.[58] Despite the acknowledgment in criminal cases, and even in much of civil jurisprudence, that state of mind is not something usually

---

54. *Marshall,* 345 F.3d 1157, 1167–68.

55. *Id.*

56. *Id.* at 1168–70.

57. *Id.* (internal quotations omitted) (quoting *Batson v. Kentucky,* 476 U.S. 79, 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)).

58. *Cf. United States v. Jones,* 159 F.3d 969, 978 (6th Cir.1998) (applying this standard and concluding that appellant is entitled to discovery. The intent prong was satisfied by proof of the arresting police officers' behavior in taunting defendant by the mailing of a racially charged postcard, and the wearing of custom-made T-shirts with inappropriate personalized language and pictures of defendant and his wife).

subject to proof by direct evidence, in the context of the federal discrimination statutes, or in the context of constitutional claims under the Equal Protection Clause, the proponent cannot rely solely on statistical evidence as he may rely to show discriminatory effect or impact.

Rather, only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation," [59] though "the [Supreme] Court has accepted statistics as proof of intent to discriminate in certain limited contexts." [60] Specifically, "[t]he Court has accepted statistical disparities as proof of an equal protection violation in the selection of a jury venire in a particular district" and "has accepted statistics in the form of multiple regressions analysis to prove statutory violations under Title VII . . . ." [61] It is possible that the Supreme Court would also accept statistics as sole proof of intent in the context of challenges to legislative redistricting. [62] None of these situations, however, is present in this case. Instead, the Defendant asks the Court to rely on his statistics, which tend to show discriminatory effect, to conclude that Deputy Schneider is intentionally discriminating against Hispanic motorists by stopping them on the basis of their ethnicity.

Dr. Withrow testified that the *Lamberth* study, like the other studies to date, is designed to measure effect. Moreover, the agencies were instructed to have the officers record the motorists' race and ethnicity, as determined or perceived by the officer during the course of the stop. One police department's data was excluded because the officers recorded their perception of race or ethnicity before they made the stop. The *Lamberth* study, by design, only measures the actual race or ethnicity of the motorist perceived or determined by the officer after the stop. The *Lamberth* study does not measure the officer's perception of race or ethnicity before making the stop. This is an important distinction, data that may demonstrate effect, but not intent.

There has been no study designed to measure an officer's intent in making traffic stops or taking other law enforcement action. Although statistics alone are generally viewed as insufficient evidence of intent, certainly a comparison of an officer's stops with similarly situated officers in his own police department might be evidence of an officer's particular pattern of discriminatory intent or motive. But in this case, the other officers in the Russell County Sheriff's department were not similarly situated because Deputy Schneider patrols I–70 exclusively, while his fellow officers patrol the town and county exclusively. The transient population is not the same as the census population. To be sure, a comparison of Deputy Schneider's stops with the stops of Kansas Highway Patrol on the stretch of I–70 some 130 miles west of Russell County supplies a basis to compare the activity of similarly situated officers. But the disparity that establishes discriminatory effect, does not establish that the discriminatory effect of

**59.** *McCleskey,* 481 U.S. at 293 n. 12, 107 S.Ct. 1756 (citing *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220).

**60.** *Id.* at 293, 107 S.Ct. 1756.

**61.** *Id.* at 293–94, 107 S.Ct. 1756; *see, e.g., Teamsters,* 431 U.S. at 324, 97 S.Ct. 1843;

*EEOC v. O & G Spring and Wire Forms Specialty Co.,* 38 F.3d 872, 876 (7th Cir.1994), *cert. denied* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

**62.** *Chavez,* 251 F.3d at 647 (citing *Hunt v. Cromartie,* 526 U.S. 541, 548–49, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)).

Deputy Schneider's conduct was itself the product of discriminatory intent.

■ To show intent, one must show causality. As Dr. Withrow testified, causality has three components: temporal order; correlation; and lack of alternative plausible explanations. The *Lamberth* study was designed to show a correlation, that is, some association (positive or negative) between the alleged cause (race or ethnicity of motorist) and effect (traffic stop).

The *Lamberth* study also attempted to demonstrate a lack of alternative plausible explanations. The seven agencies in the study were given an opportunity to explain why the data showed a statistically significant higher incidence of traffic stops of blacks and/or Hispanics. Most of the agencies offered no explanation, or explanations that were discredited by the agencies' own records.[63] The government counters that there are a host of factors that go into an officer's decision to make a traffic stop. Notably, although the government argued that the genesis of the license tag was a factor, for there are states as well as countries that are viewed as sources of drug contraband, the officers who testified denied stopping motorists on the basis of this factor.

Dr. Withrow testified that temporal order, that is, that cause precedes effect, is difficult to show in connection with traffic stops. One would have to show that the officer perceived the motorist's race or ethnicity before the stop and then made the stop. The *Lamberth* study instructed officers to record their perception or determination of race after the stop, not their perception of race before the stop. As Dr. Withrow testified, no study to date has shown temporal order. Defendant has presented no evidence that Deputy Schneider knew or perceived Defendant's race or ethnicity before he decided to make the stop. Nor is there any evidence that in any or all of his other recorded traffic stops, Schneider perceived the motorists' race before deciding to make the stop. To the contrary, Schneider, as well as Dr. Withrow ( a former law enforcement officer) testified that officers often do not or cannot perceive the race or ethnicity of the motorist before making a decision to stop.

In fact, as Dr. Withrow testified, if one were to design a study with an objective of statistically measuring the intent or motivation of law enforcement actions, one would have to adopt or model the "expert decision making" studies being done in the corporate arena. In these studies the universe of factors and circumstances that contribute to one or more decisions made by an expert is identified and catalogued by an observer. Then, through a determination of the set of factors incident to a good decision, and the application of logistic regression analysis, the set of factors and circumstances underlying good decision making can be identified. In a similar fashion, a study may be designed that can isolate the universe of contextual facts and circumstances that form a "good" decision to make a traffic stop, one that yields contraband and that is not based on impermissible motivation. Such a study has not yet been designed.

In the context of racial profiling, a study would be well on the road towards an identification of racial motive or intent using a valid scientific methodology, if the

---

63. For example, Osage County explained that their dramatically higher incidence of stops of Hispanics might be attributed to a high incidence of Hispanic motorists in the county, who drive old cars back and forth from Mexi- co, resulting in traffic stops for equipment violations. But this explanation proved to be without merit, for the county's records did not show that Hispanics were being stopped for equipment violations.

evaluative process of the law enforcement officer is observed in process, and data is collected on the various factors used with respect to each stop. Relevant factors would include pertinent demographic information about the motorist, and the "success" of the stop, that is, did it result in something other than apprehension for a traffic violation, such as the interdiction of drugs, money, or other contraband. Such a study might definitively determine whether law enforcement officers consider such factors as deployment strategies, departmental enforcement emphasis, resources allocation, crime rates, traffic enforcement patterns and other factors that are relatively race-neutral, as the government has posited. The identification of appropriate, race-neutral, sound and effective factors could then be used to evaluate an individual officer's decision making, through logistic regression analysis. Of course, such a study would require candid explanations of the decision maker as he or she processed through their discretionary decision making. Perhaps there are other inherent obstacles in such a social science study of decision making. But, if an effective study of racially discriminatory motive or intent will ever be accomplished, it will probably be based on or allegiant to this model of study.

In this context, statistics may not be the sole proof of a constitutional violation and the Defendant has not presented sufficient non-statistical evidence to demonstrate discriminatory intent.[64] Defendant has thus not met his burden of showing that Deputy Schneider intentionally discriminated against him. Defendant's Motion for Discovery is denied.

Needless to say, since Defendant has not satisfied the threshold showing required for discovery relating to his claims, he has not made a prima facie showing of selective enforcement. Accordingly, Defendant's Motion to Dismiss is also denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the Defendant's Motion for Discovery Regarding Selective Prosecution (Doc. 16) is DENIED; Motion to Dismiss (Doc. 18) is DENIED; and Motion to Suppress (Doc. 23) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion to Admit Impeachment Evidence (Doc. 44) is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.